Case No. 14-13404-AA

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

_____

JANE MCGINNIS,
Appellant-Plaintiff,

v.

AMERICAN HOME MORTGAGE SERVICING, INC.,
Appellee-Defendant.
_____

Appeal from the United States District Court
for the Middle District of Georgia

## JANE MCGINNIS'S BRIEF

Michael B. Terry
Naveen Ramachandrappa
Bondurant, Mixson & Elmore, LLP
1201 W Peachtree St NW
Ste 3900
Atlanta, GA 30309
404-881-4100

Charles A. Gower
Miranda J. Brash
Charles A. Gower, P.C.
1425 Wynnton Rd
PO Box 5509
Columbus, GA 31906
706-324-5685

## Attorneys for Jane McGinnis

Case No. 14-13404-AA
Jane McGinnis v. American Home Mortgage Servicing, Inc.

**AMENDED CIP AND CORPORATE DISCLOSURE**

On August 11, 2014, Jane McGinnis filed her Certificate of Interested Persons and Corporate Disclosure Statement.  On August 20, 2014, American Home Mortgage Servicing filed its Certificate of Interested Persons and Corporate Disclosure Statement.  In that certificate, American Home Mortgage Servicing disclosed certain additional corporate entities that it had not listed in its corporate disclosure statement filed with the district court.  Jane now amends her initial certificate to add these additional corporate entities.

The following trial judges, attorneys, persons, associations of persons, firms, partnerships, and corporations are known to have an interest in the outcome of this case or appeal:

- American Home Mortgage Servicing, Inc. (now known as Homeward Residential, Inc.)

- Abell, Teresa T.

- Bondurant, Mixson & Elmore, LLP

- Brash, Miranda J.

- Burns, Anna

- Charles A. Gower, P.C.

Case No. 14-13404-AA
Jane McGinnis v. American Home Mortgage Servicing, Inc.

- Cheesbro, Benjamin W.

- Gower, Charles A.

- Homeward Residential Holdings, Inc.

- Homeward Residential, Inc. (formerly known as American Home Mortgage Servicing, Inc.)

- Invesco LTD. (stock ticker "IVZ")

- Invesco Private Capital, Inc.

- Johnson, Michael E.

- JCM Rentals Inc.

- Lloyd, Angie

- Lloyd, Ashley

- Lloyd, Rachel

- McCurdy & Candler, LLC

- McGinnis, Adam

- McGinnis, Jane

- Ocwen Financial Corporation (stock ticker "OCN")

- Ocwen Loan Servicing, LLC

- Patterson, Cristine L.

Case No. 14-13404-AA
Jane McGinnis v. American Home Mortgage Servicing, Inc.

- Ramachandrappa, Naveen

- Reinhardt, Daniel

- Rogers, Russell J.

- Rohwedder, David

- Stanford, Denise

- Taylor, Bean & Whitaker Corp.

- Terry, Michael B.

- Thomas, Kelly

- Thompson Hine LLP

- Troutman Sanders LLP

- U.S. District Court Judge C. Ashley Royal

- WL Ross & Co., LLC

- WLR AHM Co-Invest, L.P.

- WLR/GS Master Co-Investment, L.P.

- WLR IV Parallel ESC, L.P.

- WLR Recovery Fund III, L.P.

- WLR Recovery Fund IV, L.P.

## REQUEST FOR ORAL ARGUMENT

Jane McGinnis requests oral argument in her appeal against American Home Mortgage Servicing, Inc., now known as Homeward Residential, Inc.

This action arises out of a dispute between Jane – a retiree who lives on income she earns from rental properties – and Homeward – the servicer for the loans on seven of Jane's residential properties.  From the moment Homeward took over servicing of Jane's loans on October 17, 2009 and continuing through today, Jane and Homeward have disagreed about whether Homeward has violated terms of the uniform security deed and promissory note governing Jane's loans.

In particular, Jane contends that, without proper notice and without any reasonable basis, Homeward increased the monthly escrow payments on one of Jane's loans by over 200%.  And Homeward made similarly drastic increases of the monthly escrow payments for Jane's six other loans.  After Jane repeatedly pointed out these errors, Homeward chose not to correct its mistakes and continued to insist that Jane pay the incorrect amounts.  And because Jane refused to accept Homeward's unjustified demands, Homeward assessed and collected numerous improper fees, foreclosed on one of Jane's properties, and continues to threaten foreclosure on her other properties.

Based on Homeward's wrongful conduct, Jane has asserted claims for wrongful foreclosure, conversion, interference with property rights, IIED, and

i

violations of Georgia RICO.  The district court granted Homeward summary judgment on Jane's Georgia RICO claims but allowed her to try the rest of her claims to a jury.

At the end of bifurcated trial lasting nearly four days, the jury found in Jane's favor on all of her claims and awarded her $506,000 in compensatory damages and $3,000,000 in punitive damages.  After the verdict, however, the district court granted Homeward's renewed motion for judgment as a matter of law on punitive damages and reduced the jury's award of punitive damages to $250,000 based on a limit imposed by Georgia statute.

Jane believes that oral argument would assist the Court for many reasons.

First, this case is different from most foreclosure cases, which are often brought by a borrower proceeding without an attorney or are based on extremely novel theories of liability.  The district court explained that "[t]he interesting thing about this case . . . [is that] this is the first case that I know of, in the four or five years we've been getting these, where I denied the motion for summary judgment. So it's very unusual in that respect."  R-110 at 22.

Second, this case presents issues that are more complicated than they appear at first glance.  The district court admitted that "when I started with the trial of this case I thought it was going to be fairly simple and straightforward but I found out it's anything but that."  *Id.*  The issues are complicated, not because of Jane's

theory of liability which is very straightforward, but because Homeward has no explanation for how it came up with the drastic increase in Jane's monthly escrow payments. The district court accurately described the problem, when he said "it's really a fairly simple problem from the standpoint of the Defendant, and that is, that there is no escrow evaluation." *Id.* at 48. "[T]he only testimony about this is the testimony from [Christopher] Delbene [Homeward's 30(b)(6) representative], who on the one hand said it was done and then every other time he had anything to say about the escrow . . . evaluation, is that he didn't know anything about it." *Id.* at 49. Even Homeward's counsel conceded that, "frankly my take away from Mr. Delbene is the same as yours . . . *a bag full of 'I don't know*.'" *Id.* at 50 (emphasis added).

Third, this case can help provide guidance to district courts who have expressly asked for more guidance on foreclosure cases. The district court remarked that he has had "frustration with this case. The [f]ederal courts are flooded with these mortgage cases. And they come in all the time and everybody has a lot of them." R-110 at 22. "The reality of this situation is that I hope one side will appeal this and try and get these issues straightened out so that the district court judges will be able to know what they're supposed to do in these cases with all these many issues[.]" *Id.* at 55.

Fourth, this case can also help provide guidance to district courts on Georgia

RICO, which differs from federal RICO and which courts continue to misread. Indeed, the district court in this case has repeated the same mistake other district courts have already made. The district court granted Homeward summary judgment based on a "single transaction" defense, even though the Georgia General Assembly expressly amended the Georgia RICO Act in 2001 to get rid of the single transaction defense.

For those reasons, Jane requests oral argument. Jane's counsel believes that they can assist the Court in deciding these issues, and the question-and-answer nature of oral argument will force the parties to provide direct responses to important questions.

# TABLE OF CONTENTS

AMENDED CIP AND CORPORATE DISCLOSURE ............................................1

REQUEST FOR ORAL ARGUMENT ...................................................... i

TABLE OF CONTENTS ........................................................................v

TABLE OF CITATIONS ..................................................... vii

JURISDICTION................................................................... xii

THE ISSUES................................................................................1

STATEMENT OF THE CASE...................................................3

     I.     The District Court Proceedings ...........................................3

     II.    The Facts ........................................................................7

              A.     Oct. 31, 2006 Through Oct. 16, 2009 .........................................8

              B.     Oct. 17, 2009 Through Mar. 30, 2010 ....................................10

              C.     Apr. 1, 2010 Through Dec. 31, 2010 .......................................16

              D.     Jan. 1, 2011 Through Jun. 7, 2011 ...........................................19

              E.     Jun. 8, 2011 Through Present ..................................................19

     III.    The Standard Of Review ..................................................20

SUMMARY OF ARGUMENT .............................................................21

ARGUMENT ....................................................................................22

     I.     The Jury Properly Awarded Punitive Damages Based On Its Finding That Homeward Acted With Specific Intent To Cause Harm. .................................................................................23

A.    The District Court Was Barred From Granting
       Homeward Judgment As Matter Of Law On Specific
       Intent to Cause Harm. ............................................................25

B.    There Is Sufficient Evidence to Conclude That
       Homeward Acted With Specific Intent To Cause Harm. .........35

II.    Homeward Is Liable For Violating Georgia RICO, And Jane Is
       Entitled To Additional Remedies For Those Violations....................42

A.    The Georgia RICO Act Does Not Provide For A Single
       Transaction Defense................................................................44

B.    There Is Sufficient Evidence To Conclude That
       Homeward's Predicate Acts Were Not Part Of A Single
       Transaction..............................................................................48

III.    Jane Can Recover Emotional Damages Caused By Homeward's
        Wrongful Foreclosure Without Also Having to Prove IIED. .............50

CONCLUSION........................................................................................56

CERTIFICATE OF COMPLIANCE.......................................................58

CERTIFICATE OF SERVICE ...............................................................59

vi

# TABLE OF CITATIONS

## CASES

*AAF-McQuay, Inc. v. Willis*,
    308 Ga. App. 203 (2011) ...............................................................35

*Action Marine, Inc. v. Cont'l Carbon, Inc.*,
    481 F.3d 1302 (11th Cir. 2007) ....................................................35

*Advanced Tech. Servs. Inc. v. KM Docs, LLC*,
    2011 U.S. Dist. LEXIS 134567 (N.D. Ga. Nov. 21, 2011)..........................46

*AIG Aviation, Inc. v. Boorom Aircraft, Inc.*,
    1998 U.S. App. LEXIS 2143 (6th Cir. Feb. 11, 1998)................................50

*Assicurazioni Generali, S.p.A. v. Neil*,
    160 F.3d 997 (4th Cir. 1998) .......................................................47

\*   *Bateast v. Dekalb County*,
    258 Ga. App. 131 (2002) ..............................................................41

\*   *Blackburn v. BAC Home Loans Servicing, LP,*
    914 F. Supp. 2d 1316 (M.D. Ga. 2012)...................................51, 55

\*   *Brown v. Freedman*,
    222 Ga. App. 213 (1996) .......................................................46, 49

*Clark v. West*,
    196 Ga. App. 456 (1990) ..............................................................55

*Cobb v. Kennon Realty Servs., Inc.*,
    191 Ga. App. 740 (1989) ......................................................... 46-49

*Croley v. Matson Navigation Co.*,
    434 F.2d 73 (5th Cir. 1970) .........................................................35

*Cruthis v. Firstar Bank, N.A.*,
    822 N.E.2d 454 (Ill. App. Ct. 2004).............................................55

*DeGolyer v. Green Tree Servicing, LLC*,
    291 Ga. App. 444 (2008) ..............................................................................54

*Dial HD, Inc. v. Clearone Commc'ns, Inc.*,
    2010 U.S. Dist. LEXIS 93333 (S.D. Ga. Sept. 7, 2010) ...............................47

*Dunn v. W. Union Tel. Co.*,
    2 Ga. App. 845 (1907) ..................................................................................51

*Emrich v. Winsor*,
    198 Ga. App. 333 (1991) ..............................................................................46

*Foxworthy, Inc. v. CMG Life Servs., Inc.*,
    2012 U.S. Dist. LEXIS 53009 (N.D. Ga. Apr. 13, 2012).......................47, 48

*Franklin v. Consus Ethanol LLC*,
    2012 U.S. Dist. LEXIS 123676 (N.D. Ga. Aug. 29, 2012)....................47, 48

*Fuqua Television, Inc. v. Fleming*,
    134 Ga. App. 731 (1975) ..............................................................................52

*Hamilton v. Powell, Goldstein, Frazer & Murphy*,
    252 Ga. 149 (1984) ......................................................................................50

*J.B. Hunt Transp. v. Bentley*,
    207 Ga. App. 250 (1992) ..............................................................................35

*Kirsch v. Fleet St., Ltd.*,
    148 F.3d 149 (2d Cir. 1998) .........................................................................25

*Kothari v. Patel*,
    262 Ga. App. 168 (2003) .........................................................................23, 24

*McCarter v. Bankers Trust Co.*,
    247 Ga. App. 129 (2000) ..............................................................................54

*McDaniel v. Elliot*,
    269 Ga. 262 (1998) ......................................................................................24

*Montega Corp. v. Hazelrigs*,
    229 Ga. 126 (1972) .......................................................................51

*Nat'l Indus., Inc. v. Sharon Steel Corp.*,
    781 F.2d 1545 (11th Cir. 1986) ....................................................32

*Pollman v. Swan*,
    314 Ga. App. 5 (2011) ...................................................................47

*Quinn v. Sw. Wood Prods., Inc.*,
    597 F.2d 1018 (5th Cir. 1979) ............................................27, 32, 34

*Raines v. State*,
    219 Ga. App. 893 (1996) .........................................................46, 47

*Rosenfield v. Wellington Leisure Prods., Inc.*,
    827 F.2d 1493 (11th Cir. 1987) ....................................................20

*Ross v. Rhodes Furniture, Inc.*,
    146 F.3d 1286 (11th Cir. 1998) ...........................................26, 29, 32

*S. Intermodal Logistics, Inc. v. D.J. Powers Co.*,
    10 F. Supp. 2d 1337 (S.D. Ga. 1998) ...........................................46

\*    *Shaw v. San Joaquin County,*
    2006 U.S. Dist. LEXIS 34813 (E.D. Cal. May 18, 2006) ......................34, 35

*Smith v. Chemtura Corp.*,
    297 Ga. App. 287 (2009) ..............................................................47

*Splitt v. Deltona Corp.*,
    662 F.2d 1142 (5th Cir. 1981 Unit B) ...........................................33

*Stargate Software Int'l, Inc. v. Rumph*,
    224 Ga. App. 873 (1997) .........................................................46, 47

*State Farm Fire & Cas. Co. v. Silver Star Health & Rehab*,
    739 F.3d 579 (11th Cir. 2013) ......................................................21

*Stewart v. Williams*,
   243 Ga. 580 (1979) ........................................................................52

*Sulmeyer v. Coca Cola Co.*,
   515 F.2d 835 (5th Cir. 1975) .......................................................26

*T.G. & Y. Stores Co. v. Waters*,
   175 Ga. App. 884 (1985) ..............................................................23

*Tolbert v. Queens College*,
   242 F.3d 58 (2d Cir. 2001) ....................................................26, 32

\*  *Williams v. Cobb County Sheriff's Office*,
   2014 U.S. Dist. LEXIS 87408 (N.D. Ga. June 26, 2014) ............41

*Williams Gen. Corp. v. Stone*,
   280 Ga. 631 ...................................................................................43

*Wright v. Wilcox*,
   262 Ga. App. 659 (2003) ..............................................................52

*Zieve v. Hairston*,
   266 Ga. App. 753 (2004) ..............................................................52

## UNITED STATES STATUTES

28 U.S.C. § 1291 ................................................................................ xii

28 U.S.C. § 1331 ................................................................................ xii

28 U.S.C. § 1332 ................................................................................ xii

28 U.S.C. § 1367 ................................................................................ xii

12 U.S.C. § 2609 ................................................................................10

## GEORGIA STATUTES

O.C.G.A. § 13-6-11 ...........................................................................4, 6

O.C.G.A. § 16-8-2.................................................................................42

O.C.G.A. § 16-8-4.................................................................................42

O.C.G.A. § 16-14-3....................................................................42, 44, 45

O.C.G.A. § 16-14-4.................................................................................42

O.C.G.A. § 16-14-6..........................................................................43, 50

O.C.G.A. § 51-12-5.1..........................................................................1, 23

## FEDERAL RULES

Fed. R. Civ. P. 50.................................................................................25

Fed. R. Civ. P. 50, 2006 Adv. Cmte. Notes.........................................25

## FEDERAL REGULATIONS

24 C.F.R. § 3500.17.............................................................................10

## SECONDARY SOURCES

Restatement Torts, 2d, § 8A, Cmt. b. (1965)...................................35, 39

\* John E. Floyd, "Georgia RICO," *Georgia Business Litigation* (2014) .............45, 46

## JURISDICTION

This is a direct appeal from the district court's order on Homeward's renewed motion for judgment as a matter of law and alternative motion for new trial and the district court's final amended judgment based on that order.  R-124; R-125.

The district court had diversity jurisdiction to hear this case.  *See* 28 U.S.C. § 1332 (a).  Jane is a citizen of Florida, and Homeward is a Delaware corporation with its principal place of business in Texas.  R-30 ¶¶ 1-2.  The amount in controversy is more than $75,000.  R-98.  The district court also had federal question jurisdiction to hear Jane's claims under RESPA and supplemental jurisdiction to hear her claims under Georgia law.  *See* 28 U.S.C. § 1331; 28 U.S.C. § 1367 (a).

This Court has jurisdiction to hear this case because Jane has timely appealed from the district court's final judgment.  *See* 28 U.S.C. § 1291.  On June 30, 2014, the district court granted in part Homeward's renewed motion for judgment as a matter of law, denied the remainder of its motion for judgment as a matter of law, and denied its motion for new trial.  R-124.  On July 2, 2014, the district court entered a final amended judgment based on that order.  R-125.  On July 29, 2014, Jane filed a timely notice of appeal.  R-127.

**THE ISSUES**

Jane McGinnis raises three issues in her appeal against American Home Mortgage Servicing, Inc., now known as Homeward Residential, Inc.

The first issue involves punitive damages.  During the second phase of the trial and by special verdict, the jury found that Homeward "acted with specific intent to cause the Plaintiff harm," which allowed the jury to "award punitive damages in excess of $250,000."  R-96 at 1; R-111 at 26; *see also* O.C.G.A. § 51-12-5.1.  But the district court held that, as a matter of law, Homeward did not act with specific intent to cause harm and reduced the jury's award to $250,000.  R-124 at 42.  That ruling presents the following issue: (a) because Homeward did not request judgment as a matter of law on the issue of specific intent to cause harm during the trial, was the district court barred from granting judgment as a matter of law on this issue after trial; and (b) even if Homeward had requested judgment as a matter of law on the issue during trial, was there sufficient evidence for the jury to conclude that Homeward acted with specific intent to cause harm?

The second issue involves Georgia RICO.  During the first phase of the trial and by special verdict, the jury found that Homeward wrongfully foreclosed Jane's real property, converted Jane's personal property, and interfered with Jane's property rights – each of which supports the predicate acts necessary for a pattern of racketeering activity.  R-93 at 1.  But the district court previously granted

1

summary judgment to Homeward on Jane's Georgia RICO claim because those predicate acts were part of a single transaction. R-62 at 49. That ruling presents the following issue: (a) because the Georgia RICO Act expressly provides that predicate acts can be part of a single transaction, is Homeward liable for its violations of Georgia RICO; and (b) even if the Georgia RICO Act did provide for a single transaction defense, was there sufficient evidence for the jury to conclude that Homeward's predicate acts were not part of a single transaction?

The third issue involves emotional damages. During the first phase of the trial and by special verdict, the jury found that Homeward acted intentionally or recklessly in wrongfully foreclosing on Jane's property. R-110 at 129-31. But the district court instructed the jury that, for Jane's "wrongful foreclosure claim only," she also had to prove the separate tort of IIED to recover emotional damages. *Id.* at 133. That ruling presents the following issue: because Georgia law provides that emotional damages are recoverable for any tort established by intentional or reckless misconduct, can Jane recover emotional damages for wrongful foreclosure, without having to prove the separate tort of IIED?

Jane raises the first two issues directly; they are based on rulings by the district court that were adverse to and harmed her.

Jane raises the third issue conditionally; it is based on a ruling that was adverse to her but does not currently harm her. Because the jury did, in fact, find

2

that Jane had proved IIED, there is no need to address this third issue if the Court

affirms the district court's judgment on that claim.  R-93 at 2.  And because the

trial court instructed the jury that, for Jane's conversion and interference with

property rights claims, she did not have to prove IIED to recover emotional

damages and Homeward did not to object to that instruction, there is also no need

to address this third issue if the Court affirms the district court's judgment on those

claims.  R-110 at 133.

The Court must decide the third issue only if, based on Homeward's cross-

appeal, the Court directs judgment as a matter of law on all of Jane's claims except

her wrongful foreclosure claim or if the Court orders any new trial involving Jane's

wrongful foreclosure claim.  In that situation only, this Court would need to correct

the trial court's error.

## STATEMENT OF THE CASE

### I.    The District Court Proceedings

On July 21, 2011, Jane filed this civil action against Homeward in the

United States District Court for the Middle District of Georgia.  R-1.  On February

9, 2012, the district court granted Jane's motion for default judgment.  R-7.

However, on February 5, 2012, the district court granted Homeward's motion to

open the default judgment.  R-14 at 4.

Following the opening of the default judgment and after some initial

discovery, on October 4, 2012, Jane filed an amended complaint against

Homeward.  R-30.  In her amended complaint, Jane asserted nine claims: (1)

wrongful foreclosure; (2) RESPA; (3) intentional infliction of emotional distress;

(4) conversion; (5) tortious interference with property rights; (6) defamation; (7)

Georgia RICO; (8) attorney fees pursuant to O.C.G.A. § 13-6-11; and (9) punitive

damages.  *Id.* at 20-34.

Around the close of discovery, on January 14, 2013, Homeward moved for

summary judgment.  And on January 28, 2013, Homeward moved to exclude

testimony from Jane's proposed expert, Thomas Patrick Berry.  R-34; R-43.

On July 2, 2013, the district court issued an order granting in part and

denying in part both Homeward's motion for summary judgment and motion to

exclude testimony from Thomas Berry.  As for summary judgment, the district

court granted summary judgment on Jane's claims for RESPA, defamation,

Georgia RICO, and any wrongful foreclosure claim based on Homeward's failure

to respond to her communications.  R-62 at 51-52.  The district court denied

summary judgment on the remainder of Jane's claims.  *Id.*

As for the testimony of Thomas Berry, the district court granted the motion

to exclude testimony from Berry regarding whether Homeward's escrow analysis

violated the deed and note – which the district court concluded were "lay matters

which a jury is capable of understanding."  R-124 at 16.  The district court denied

4

the motion to exclude testimony from Berry regarding the amounts in Jane's escrow accounts and whether Homeward's escrow analysis was inconsistent with general accounting practices.  R-62 at 51.

After the district court's order on summary judgment and the testimony of Berry, on July 22, 2013, Homeward moved to bifurcate the trial into two phases – one for liability and another for punitive damages and attorney fees.  R-69.  The district court granted this motion.  R-75.  Also on July 22, 2013, Homeward moved to exclude various types of evidence, including the testimony of its own 30(b)(6) witness, Christopher Delbene.  Jane did not oppose some of Homeward's minor requests for exclusion, and otherwise the district court largely denied Homeward's motions.  R-75.

On August 18, 2013, the parties filed their pre-trial order, and the trial began the following day.  R-87.  The trial lasted from August 19 through August 22, 2013.  Jane put on her case first, and after the end of her case during the first phase of the trial, the district court and the parties discussed and heard objections to jury instructions.  R-109 at 189-208.  After the conference on jury instructions, Homeward moved under Rule 50 (a) for judgment as a matter of law on Jane's claims for conversion, wrongful foreclosure, interference with property rights, and IIED.  R-109 at 208-228.  The district court did not grant Homeward's Rule 50 (a) motion.  Homeward then put on its case, which consisted of one witness –

5

Christopher Delbene, who testified by video deposition.  R-110 at 4.  After the end of its case, Homeward renewed its motion for a judgment as a matter of law.  *Id.* at 40.  Homeward did not add any new grounds, and the district court again did not grant Homeward's motion.  *Id.*

The district court then submitted the first phase of the case to the jury.  By special verdict, the jury found in Jane's favor on each of her claims – conversion, wrongful foreclosure, interference with property rights, and IIED.  R-93 at 1-2. The jury awarded Jane $500,000 in emotional distress damages and $6,000 in other compensatory or actual damages.  *Id.* at 2.  And the jury found that Jane could recover attorney fees and punitive damages.  *Id.*

The district court recommenced the trial and began the second phase of the case.  Jane's counsel stated that he did not intend to put on any additional evidence and Jane was waiving her claim for attorney fees pursuant to O.C.G.A. § 13-6-11. R-111 at 7.  Homeward's counsel chose not to put on any additional evidence, and Homeward did not request judgment as a matter of law during the second phase. Counsel for both sides then made closing arguments regarding punitive damages.

The district court submitted the second phase of the case to the jury.  By special verdict, the jury again found in Jane's favor, finding that "the Defendant acted with specific intent to cause the Plaintiff harm" and awarding Jane $3,000,000 in punitive damages.  R-96 at 1.

6

On August 23, 2013, the district court entered judgment consistent with the jury's verdicts from each phase.  R-93; R-98.  And on September 5, 2013, the district court formally denied Homeward's Rule 50 (a) motion.  R-99.

On September 20, 2013, Homeward renewed its motion for judgment as a matter of law and also moved for a new trial or to alter and amend the judgment.  R-104, R-105.  On June 30, 2014, the district court granted in part Homeward's motion for judgment as a matter of law by holding that there was no evidence that Homeward acted with specific to cause harm and by reducing the jury's award of punitive damages to $250,000.  R-124 at 1-2.  The district denied the remainder of Homeward's motion for judgment as a matter of law and denied the entirety of Homeward's motion for new trial.  *Id.*  On July 2, 2014, the district court entered amended judgment consistent with its June 30 order.  R-125.

On July 29, 2014, Jane filed a timely notice of appeal.

## II.    The Facts

Jane is a retiree who lives on rental income.  She and her husband worked extremely hard during their lives, and they used their income to buy rental properties in Monticello, Georgia, where they lived for almost fifty years.  The rental properties were meant to serve as retirement income for both of them.  R-109 at 65, 152-55.  Jane's husband, however, had different plans, and he left Jane for a younger woman.  When the divorce was completed in 2006, Jane was

7

awarded a number of the properties.  *Id.* at 152-55.

Around the same time, Jane decided to move to St. Augustine, Florida, so that she could spend more time with her daughter Jodie and Jodie's family.  *Id.* at 7.  Jane put her son, Adam McGinnis, in charge of renting the properties and dealing with the banks.  *Id.* at 68.  In fact, all of the notices and letters regarding Jane's loans are directed to go to Adam's house.  Adam actually works in the "real estate business" himself, and he is a "certified residential appraiser."  *Id.* at 5, 67.  He also has a degree in finance from West Georgia College.  *Id.* at 67.  Adam's wife also helps with the bookkeeping for Adam's real estate business and Jane's rental property business.  *Id.* at 7.  And although Adam is in charge of Jane's rental properties, Adam talks with his mother regularly, keeps her up-to-date with her properties, and has included her in many calls with the bank.  *Id.* at 42.

Jane owns a number of rental properties, but the primary dispute in this case centers on the monthly escrow payments for a residential rental property she owned at 172 Hilton Street in Monticello, Georgia.  Many of the same problems that Jane experienced with the loan for this property happened with six of other other loans.  The relevant facts divide into five different time periods.

### A.    Oct. 31, 2006 Through Oct. 16, 2009

On October 31, 2006, Jane refinanced seven of her residential rental properties with Taylor, Bean & Whitaker.  She granted security deeds and

8

promissory notes to TB&W, and all of the deeds and notes were Fannie Mae/Freddie Mac uniform instruments.  R-89-2 (Deed for 172 Hilton Street); R-90-3 (Note for 172 Hilton Street).  They also have a family rider, which provides that a default on any one of the loans triggers a default on all of the others.

The deed and note impose obligations on Jane.  Among other things, she must make payments of principal, interest, and escrow items on the first of each month.  R-90-3 at 1.  If Jane does not make such payments by the fifteenth of each month, the lender can assess a late charge of 5% of the overdue payment of principal and interest.  *Id.* at 2.  Jane must also make full payments; if she does not, the lender can hold partial payments and not apply them until the lender receives a full payment.  R-89-2 at 3-4.

Similarly, the deed and note impose obligations on the lender.  Among other things, the lender must accept and apply all full payments.  *Id.*  And for escrow items, the lender may "collect and hold Funds in an amount . . . not to exceed the maximum amount a lender can require under RESPA."  *Id.* at 4.  The lender "shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law."  *Id.*  "If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance

9

with RESPA, but in no more than 12 monthly payments." *Id.* at 5.  Thus, even

though RESPA does not itself apply to Jane's loans, the deed and note

contractually incorporate RESPA and its implementing regulations.  *See* 12 U.S.C.

§ 2609; 24 C.F.R. § 3500.17.

Although the deed and note are Fannie Mae/Freddie Mac instruments, Jane's

loans were not actually bought by Fannie Mae or Freddie Mac.  Instead, as soon as

TB&W originated the loans, it packaged Jane's loans and sold them as part of

mortgage backed security.  R-108 at 41.  The owner of the loans is a trust, and U.S.

Bank, N.A. is the trustee.  *Id.*  TB&W, however, retained servicing rights, which

meant that it continued to collect payments.  *Id.*  And so, from October 31, 2006

through October 16, 2009, TB&W did just that.  TB&W sent monthly billing

statements and escrow notices to Adam, and he made timely and full payments.

Through the end of October 2009, Jane was current on the payments for all of her

loans.  R-108 at 66-67; R-109 at 11.

**B.    Oct. 17, 2009 Through Mar. 30, 2010**

Things got "crazy" after October 16, 2009.  R-109 at 25.  Although Jane was

current on all of her debts, TB&W was not.  In August 2009, the FDIC froze

TB&W's accounts, TB&W filed for bankruptcy, and TB&W's servicing contracts

were sold or transferred to other servicers.  Homeward obtained the rights to

service Jane's seven loans from TB&W, and effective October 17, 2009,

10

Homeward became Jane's new servicer.  On October 27, 2009, Homeward sent

Adam a welcome letter for each of Jane's seven loans.  R-90-5 (Def.'s Ex. 89).

The very first thing Homeward did when they got Jane's loans was to

*drastically* increase Jane's monthly payments.  On her loan for 172 Hilton Street,

Homeward included a payment coupon with its welcome letter.  The coupon said

that Jane's November 2009 payment was $843.58.  *Id.* at 1.  But Jane's October

2009 payment to TB&W was only $605.58.  In other words, within the first ten

days of servicing Jane's loan, Homeward had increased her total monthly payment

by nearly 40%.  The same thing happened with Jane's other loans.

Despite this drastic and sudden increase in Jane's monthly payment,

Homeward did not provide any explanation for this increase.  The payment coupon

simply listed the amount Homeward said Jane owed.  Adam also did not receive a

monthly billing statement for November 2009; in fact, Adam has never received

any regular monthly billing statements from Homeward, even to this day.  R-109 at

140.  And so, knowing that Jane did not in fact owe $843.58, Adam timely

submitted a check to Homeward for $605.58 to cover Jane's November 2009

payment for the loan for 172 Hilton Street.  He made similar timely and correct

payments for Jane's other loans.

Yet, just after Adam submitted the November 2009 payments, Homeward's

employees and agents began making collection calls to Adam.  "[T]hey called and

11

said . . . that we did not make our November payment." R-109 at 11. They also said that "some checks . . . were lost by Taylor, Bean and Whitaker." *Id.*; *see also id.* at 23-24 ("[Y]ou were talking to them and they were telling you you were still a payment behind? A. Yes, sir. Q. To Taylor, Bean and Whitaker? A. Yes, sir."). And because each loan is a separate account, Adam repeatedly received collection calls on all seven loans. Even though Adam explained that he had timely made all payments, "it was upsetting." *Id.* at 11. "[I]t got so annoying through the holidays, through the Thanksgiving holidays and everything else, that we were behind. That we were behind not only on one but on all the rental properties[.]" *Id.*

When December 2009 came around, Adam again submitted timely and correct payments on all of Jane's loans. On December 16, 2009, Homeward conducted an escrow analysis for 172 Hilton Street and, on December 17, it mailed this escrow disclosure statement to Adam. R-89-20 at 1 (Pl.'s Ex. 8). The statement describes Jane's "present payment" as $843.58, consisting of $490.13 for principal and interest and $353.45 for escrow deposit. *Id.* By present payment, Homeward means that Jane owed $843.58 for November 2009 through January 2010. *Id.* The statement then describes Jane's "new payment effective 02/01/2010" as $680.08, consisting of $490.13 for principal and interest, $138.46 for escrow deposit, and $51.49 for escrow shortage. *Id.*

The December 16, 2009 escrow analysis was the first escrow analysis

Homeward ever sent Adam, and Adam knew that there were a number of problems

with it.  For one, it showed that Jane's *present* payment was $843.58 and that the

escrow deposit – not a shortage – was $353.45.  This was incorrect because Jane's

present payment was $605.58 with an escrow deposit of $115.45.  In other words,

Homeward had inflated Jane's escrow deposit by over 200% without any

explanation or justification.  The other problem was that, even though it was less

than the alleged present payment, the new payment effective for February 2010

was also unusually high.  R-109 at 13 ("[I]t just seemed like something was really,

really wrong or the accounting practice had gone just crazy.").

As soon as Adam received the December 16, 2009 escrow analysis, he

called Homeward to dispute the amounts.  He also sent Homeward a fax with proof

that he had made all of Jane's payments to TB&W and Homeward; he had not

been receiving billing statements; he should not be charged any late fees; and the

escrow amounts were too high.  R-89-23 (Pl.'s Ex. 23).

Although Adam would not learn all of these details until later, Homeward's

drastic and sudden increase in Jane's monthly payments was causing lots of

unexpected problems.  For example, because Homeward incorrectly believed that

Jane owed $843.58 on the loan for 172 Hilton Street beginning in at least

November 2009, Homeward treated Jane's November 2009 payment as a partial

payment.  Homeward did not apply the payment to the loan, and instead

Homeward put the payment in a suspense account.  R-89-3 at 1 (Pl.'s Ex. 6).  This is why Adam was receiving calls in November 2009 from collection agents saying that Jane had not made her November 2009 payment.  R-46 at 25.

As for Jane's December 2009 payment, Homeward also treated that as a partial payment and put it in the suspense account.  But once the November 2009 and December 2009 payments were received and combined, Homeward then had what it considered to be a full payment of $843.58.   And so, on December 18, 2009, Homeward withdrew $843.58 from the suspense account to cover the payment for November 2009.  R-89-3 at 2.  But at that point, Homeward treated the November 2009 payment as late, and so they also assessed and collected a late fee of around $14.50 from Jane's loan payments.  R-46 at 81-82 ("[W]e took funds out to pay the late charge as well . . . and reduced the late fee to $14.69").  And this is why Adam was also told on the phone that he had late charges in addition to being behind on his payments.

This practice – treating Jane's payments as partial payments, holding them in a suspense account until the payments combined to what Homeward considered to be a full payment, and then collecting that payment and a late fee – would continue for the *entire time* that Homeward serviced Jane's loans.  Not only did Jane lose money through late fees and other improper fees, but it has also meant that the interest on her loans is higher than it should have been.  After all,

14

Homeward has been delaying payment of interest on every month.

Of course, Adam did not know the full nature of Homeward's mistakes at this time, and so he thought his phone call and fax would fix the problem.

When January 2010 came around, Adam again submitted timely and correct payments on all of Jane's loans.  But Homeward had not fixed its mistakes, and throughout January 2010, Homeward continued making collection calls and sending collection letters, and now Homeward was beginning to threaten foreclosure.  This type of harassment would become a constant fixture in Adam and Jane's lives.  In fact, Adam explained that, if he were to "if you stacked all the collection letters together," they would reach "[f]ive feet high."  R-109 at 33-34.

On January 15, 2010, Homeward sent Adam a letter regarding its December 16, 2010 escrow analysis.  The letter explained that the recent "escrow analysis on your loan . . . could have erroneously reflected either an escrow overage or shortage due to missing information."  R-89-21 at 1 (Pl.'s Ex. 14).  The letter then said to disregard the December 16 escrow analysis and to continue making payments at the present monthly payment amount.  *Id.*  Based on this letter, Adam thought this might finally fix the problem. Homeward recognized that they had made a mistake and would send a new escrow analysis.

When February 2010 came around, Adam again submitted timely and correct payments on all of Jane's loans.  But again Homeward did not fix its

15

mistakes and continued harassing Adam and Jane with collection letters and calls.

On February 19, 2010, Homeward conducted a second escrow analysis and, on February 20, it mailed this escrow disclosure statement to Adam. R-89-15 at 1 (Pl.'s Ex. 15). Adam expected that this new escrow analysis would fix the problem, but it in fact repeated the same mistake from the December 16, 2010 escrow analysis. It describes Jane's present payment as $843.59, which somehow increased the payment an additional one cent. By present payment, Homeward means that Jane owed $843.59 for November 2009 through and March 2010. *Id.* The statement then describes Jane's new payment effective April 1, 2010 as $638.32, consisting of $490.13 for principal and interest, $140.55 for escrow deposit, and $7.64 for escrow shortage. *Id.*

As soon as Adam received the February 19, 2010 escrow analysis, he called Homeward to dispute the amounts. Although Homeward had finally reached a reasonable monthly escrow payment for payments effective April 1, 2010 and moving forward, Homeward still continued to show incorrect amounts for present payments due. And just has he had done before, he also sent Homeward a fax with proof that he had made all of Jane's payments to TB&W and Homeward; he had not been receiving billing statements; he should not be charged any late fees; and the escrow amounts were too high. R-89-26 (Pl.'s Ex. 11).

## C.    Apr. 1, 2010 Through Dec. 31, 2010

The same pattern of problems that Adam and Jane experienced from October 17, 2009 through March 30, 2010 continued for the rest of 2010. Every month Adam timely and correctly submitted payments for $605.58, and every month Homeward would put Jane's payments into a suspense account and later collect and assess late fees. R-89-3 at 1-9 (Pl.'s Ex. 6).

Although Homeward finally reduced Jane's monthly payments to $638.32 by April 1, 2010, Homeward never backed down from its position that Jane owed $843.58 or $843.59 for November 2009 through March 2009. As a result, Homeward always considered Jane behind, it always put Jane's payments into a suspense account, and it always assessed late fees. R-109 at 15. Around this time, Homeward also began assessing fees for collection letters, inspections, and other fees relating to the default that Homeward caused. R-89-3 at 1-9 (Pl.'s Ex. 6).

Not only did Homeward not change its position, it also refused to provide any defense of its demand that Jane owed $843.58 or $843.59 for November 2009 through March 2009.

For example, on May 19, 2010, Adam sent Homeward yet another fax explaining that Jane's correct payment for November 2009 through March 2009 should be $605.58. R-89-10 at 1-15 (Pl.'s Ex. 9). He even provided Homeward with an escrow analysis of his own account and offering to pay that amount:

> The new total tax and insurance is 1686.59 for the year divided by 12 equals 140.55/month plus the 490.13 is ($630.68). *I have tried to*

17

> *explain this over and over again* showing you that in February the
> 24th via fax and conversation with someone I though[t] understood
> was helping resolve this and still nothing.  I know I owe you little
> more for the shortage in the escrow (tax and insurance) only but *I
> have not at any time had a payment of $843.59* . . . with TB&W or
> with AHMSI.  I want to pay this loan off ASAP.  I will not pay any
> late fees or any differences in monthly payments. . . . I need for
> AHMSI to come up with a payoff as of June 1ˢᵗ 2010[.]

*Id.* at 1-2 (emphasis added); *see also* R-109 at 63 ("I'm familiar with how to do

it.").

Adam's analysis was essentially identical to Homeward's February 19, 2010

escrow analysis as to the correct amount for Jane's payments from April 2010 and

moving forward.  The only difference is that Adam rightly refused to pay the

$843.59 amount that Homeward insisted that Jane owed for November 2009

through March 2009 and any late fees associated with those payments.

On June 30, 2010, Homeward responded to Adam's requests by letter.  R-

90-8 at 1-2 (Pl.'s Ex. 19).  The letter did not provide any explanation of the

$843.59 amount, and the letter did not provide any payoff amount – either with

fees or without.  Instead, the letter said that "[t]he late charges of $73.53 . . . were

assessed by . . . Taylor, Bean & Whitaker."  *Id.* at 1.  Adam learned that this

statement was false and is contradicted both Homeward's own loan history.  R-89-

3 at 1-9.  In short, Homeward's letter did nothing to explain their position, and it

was becoming clear that Homeward did not care that it was wrong.  R-109 at 41

("Nothing makes sense with this. . . . It's a grab at money.").

In August 2010, Adam and a Homeward representative exchanged a series of phone calls.  Adam once again offered to pay the $638.32 monthly payments and make up any difference, but he rightly refused to pay the $843.58 or $843.59.  The representative refused his offer and once again did not provide any defense of the $843.59 amount.

### D.    Jan. 1, 2011 Through Jun. 7, 2011

By January 2011, Adam and Jane hoped that Homeward had finally fixed its errors and that the payment discrepancies had finally balanced out.  And so from January 2011 through June 2011, Adam timely and correctly submitted payments for $638.32, which is what he had offered many times to do.  He had hoped that Homeward had finally given up on its insistence that he had owed more than that.

But Homeward did not change it position; instead, it double-downed.  On February 17, 2011, Homeward's agents sent a notice of acceleration.  Homeward also returned or rejected Jane's payments from February 2011 through May 2011. R-89-13 at 40-42.  On March 22, 2011, Homeward's attorneys sent a formal notice of foreclosure for 172 Hilton Street, and starting in April 2011 and running for at least eight weeks, Homeward ran foreclosure advertisements for the Monticello paper of record.  R-109 at 41-42.  Finally, on June 7, 2011, Homeward foreclosed on 172 Hilton Street.  R-90-17 at 1-7 (Def.'s Ex. 418).

### E.    Jun. 8, 2011 Through Present

19

Not satisfied with wrongfully foreclosing on one of Jane's properties, Homeward has continued its misconduct.  On June 9, 2011, two days after Homeward foreclosed on 172 Hilton Street, Homeward cashed Jane's June 2011 payment, which Adam had submitted before the foreclosure sale.  R-108 at 82-83. Homeward has also continued the same pattern of holding payments in suspense accounts, assessing late fees, returning checks, and threatening foreclosure.  R-109 at 61-63 ("The situation was going on as of two week ago.  They are . . . moving towards foreclosure on another piece of property my mother owns.").

All of these experiences have absolutely devastated Jane.  They have been the "major cause of her depression."  R-82-2 at 61 (Andrew Sappington).[1]  The severity of her emotional distress has caused her to suffer major physical symptoms, including "projectile vomiting," and she views the situation as "as life or death."  *Id.* at 15, 13.  In her own words, "I am too old to start over.  They have taken my life away from me."  R-109 at 165.

## III.    The Standard Of Review

The Court reviews both judgment as a matter of law and summary judgment *de novo* and "with all reasonable inferences most favorable to the party opposed to the motion."  *Rosenfield v. Wellington Leisure Prods., Inc.*, 827 F.2d 1493, 1494 (11th Cir. 1987).  And the Court reviews "jury instructions *de novo* to determine

---

[1] Andrew Sappington's video deposition was played at trial.  R-109 at 150.

whether they misstate the law or mislead the jury to the prejudice of the party who objects to them." *State Farm Fire & Cas. Co. v. Silver Star Health & Rehab*, 739 F.3d 579, 585 (11th Cir. 2013).

## SUMMARY OF ARGUMENT

Jane raises three issues in this appeal.

First, although the jury properly awarded punitive damages based on its finding that Homeward acted with specific intent to cause harm, the district court granted Homeward's motion for judgment as a matter of law on this issue and reduced the jury's punitive damages award to $250,000.   This ruling is wrong for two reasons.  Because Homeward did not request judgment as a matter of law on this issue during the trial, the district court was barred from granting judgment as a matter of law after trial.  And even if Homeward had requested judgment as a matter of law on this issue during trial, there was sufficient evidence for a jury to conclude that Homeward acted with specific intent to cause harm.

Second, although Jane presented sufficient evidence for the district court to submit her Georgia RICO claims to the jury, the district court granted Homeward's motion for summary judgment on this issue based on a "single transaction" defense.  This ruling is also wrong for two reasons.  The Georgia RICO Act does not provide for a single transaction defense, and even if it did provide for such a defense, there is sufficient evidence for a jury to conclude that Homeward's

21

predicate acts were not part of a single transaction.

Third, although the district court instructed the jury that they could award emotional damages if Jane proved either her conversion claim or interference with property rights claim, the district court imposed additional restrictions on Jane's recovery of emotional damages caused by wrongful foreclosure.  The district instructed the jury that Jane also had to prove the separate tort of IIED to recover emotional damages caused by wrongful foreclosure.   This instruction regarding wrongful foreclosure is incorrect.  Georgia law allows injured parties to recover emotional damages if the party established the damages were caused by an intentional tort, and Georgia courts have repeatedly permitted parties to recover such damages without requiring the party to also prove the separate tort of IIED.

Jane raises the first two issues directly; they are based on rulings by the district court that were adverse to and harmed her.  Jane raises the third issue conditionally; it is based on a ruling that was adverse to her but does not currently harm her.  The Court must decide the third issue only if, based on Homeward's cross-appeal, the Court directs judgment as a matter of law on all of Jane's claims except her wrongful foreclosure claim or if the Court orders any new trial involving Jane's wrongful foreclosure claim.  In that situation only, this Court would need to correct the trial court's error on this issue.

**ARGUMENT**

22

**I.    The Jury Properly Awarded Punitive Damages Based On Its Finding That Homeward Acted With Specific Intent To Cause Harm.**

Georgia law requires a bifurcated proceeding for punitive damages. O.C.G.A. § 51-12-5.1 (d)(1).  In the first phase, the jury "shall first resolve from the evidence produced at trial *whether* an award of punitive damages shall be made."  *Id.* (emphasis added).  And during this phase, a jury may award punitive damages if an injured party proves "by clear and convincing evidence that the defendant's actions showed willful misconduct . . . or that entire want of care which would raise the presumption of conscious indifference to the consequences." O.C.G.A. § 51-12-5.1 (b).  In other words, a jury may award punitive damages even where the injured party proves only recklessness.  *See, e.g.*, *T.G. & Y. Stores Co. v. Waters*, 175 Ga. App. 884, 885 (1985) ("It is sufficient if the defendants' acts were wanton or were done with a reckless disregard for or a conscious indifference to the rights of the plaintiff[.]").

In the second phase, "the trial shall immediately be recommenced in order to receive such evidence as is relevant to a decision regarding *what amount* of damages will be sufficient."  O.C.G.A. § 51-12-5.1 (d)(2) emphasis added).  And during this phase, if the case does not involve products liability or the use of illegal substances, the injured party must prove by the preponderance of the evidence and by special verdict "that the defendant acted, or failed to act, with the specific intent to cause harm."  O.C.G.A. § 51-12-5.1 (f); *see also Kothari v. Patel*, 262 Ga. App.

23

168, 171-72 (2003); *McDaniel v. Elliott*, 269 Ga. 262, 265 (1998).  In other words, a jury must find more than recklessness; and if they do not, the jury's award of punitive damages cannot exceed on to $250,000.  *Id.*

In this case, at the end of the first phase of the trial, the jury found in favor of Jane on her claims for wrongful foreclosure, conversion, interference with property, and IIED.  R-93 at 1-2.  The jury awarded Jane emotional distress damages in the amount of $500,000 and other compensatory or actual damages of $6,000.  The jury then found that Jane could recovery attorney fees and punitive damages.  *Id.* at 2.  The district court then recommenced the trial and began the second phase, where the parties could present additional evidence and argument.

At the end of the second phase of the trial, the jury again found in favor of Jane, finding "that the Defendant acted with specific intent to cause the Plaintiff harm" and then awarding Jane $3,000,000 in punitive damages.  R-96 at 1.

The district court, however, granted Homeward's renewed motion for judgment as a matter of law on punitive damages.  The district court held that, as a matter of law, Homeward did not act with specific intent to cause harm and reduced the jury's award of punitive damages to $250,000.  R-124 at 42.

The district court's ruling is wrong for two reasons.  First, because Homeward did not request judgment as a matter of law on the issue of specific intent to cause harm during the trial, the district court was barred from granting

judgment as a matter of law on this issue after trial.  Second, even if Homeward had requested judgment as a matter of law on this issue during trial, there was sufficient evidence for a jury to conclude that Homeward acted with specific intent to cause harm.

### A.    The District Court Was Barred From Granting Homeward Judgment As Matter Of Law On Specific Intent to Cause Harm.

Rule 50 (a) provides that a party may move for judgment as a matter of law "before the case is submitted to the jury."  Fed. R. Civ. P. 50 (a)(2).  "The motion must specify the judgment sought and the law and facts that entitle that movant to the judgment."  *Id.*  If a district court does not grant the motion, Rule 50 (b) provides that for "a renewed motion" after trial.  Fed. R. Civ. P. 50 (b).

By its express language, Rule 50 (b) provides only for a *renewed* motion, and so a district court can grant such a motion "only on grounds advanced in the pre-verdict motion."  Fed. R. Civ. P. 50, 2006 Adv. Cmte. Notes.  In other words, a district court cannot consider "law and facts" that a party did not raise in its Rule 50 (a) motion.  *See Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 164 (2d Cir. 1998) ("[A]lthough a motion for JMOL may be 'renewed' after the jury returns its verdict, it may be renewed only on grounds that were *specifically* articulated before submission of the case to the jury.") (emphasis added and citations omitted).

In addition to the express language of Rule 50, there are constitutional reasons for why a district court cannot consider new grounds raised in a renewed

25

motion for judgment as a matter of law.

The rule protects a non-moving party's constitutional right to a jury trial by ensuring the party has the opportunity to correct any alleged evidentiary deficiency before the district court submits the case to the jury. "[It] go[es] to the heart of our concerns that a plaintiff's Seventh Amendment rights not to be ambushed and that a plaintiff be allowed to cure evidentiary deficiencies before the jury retires." *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1290 (11th Cir. 1998); *see also Tolbert v. Queens College*, 242 F.3d 58, 76-77 (2d Cir. 2001) ("[T]he motion must be sufficient to inform the opposing party of the precise issue as to which more evidence is needed in order to warrant its submission to the jury.").

The rule also protects a non-moving party's constitutional right against re-examination of facts by the district court. It ensures that the district court only tests the legal sufficiency of the party's case and is not tempted to engage in a re-examination influenced by the jury's actual factual findings. "It would be a constitutionally impermissible re-examination of the jury's verdict for the district court to enter judgment n.o.v. on a ground not raised in the motion for directed verdict." *Sulmeyer v. Coca Cola Co.*, 515 F.2d 835, 846 (5th Cir. 1975).

Lastly, the rule barring consideration of new grounds raised in a renewed motion for judgment as a matter of law is also based on judicial efficiency and judicial estoppel. If a party believes that the non-moving party's evidence is

26

*legally* insufficient, the party should make that argument before the verdict, so that the trial court can decide that issue without unnecessary prolonging the proceedings.  And if a party does not make that argument, the party "must have been of the view that the evidence made a case for the jury; he should not be permitted on appeal to impute error to the trial judge for sharing that view." *Quinn v. Sw. Wood Prods., Inc.*, 597 F.2d 1018, 1024 (5th Cir. 1979).

In this case, the district court violated Rule 50 and undermined the rule's constitutional protections and judicial purposes by granting Homeward judgment as a matter of law on the issue of specific intent to cause harm.  Homeward did not request such judgment in its Rule 50 (a) motion, and so the district court was barred from addressing it in a Rule 50 (b) motion.

A review of the trial transcript confirms that Homeward did not request judgment as a matter of law on the issue of specific intent to cause harm.  During the first phase of the trial, Homeward moved for judgment as a matter of law after the close of Jane's evidence and after the parties had discussed jury instructions with the district court.

Homeward moved for judgment as a matter of law only as to Jane's claims for conversion, wrongful foreclosure, interference with property rights, and IIED.  R-109 at 208-228.  As to conversion, Homeward argued that it complied with the deed and note when it increased Jane's monthly escrow payment in October 2009.

27

Because Jane did not pay Homeward's increased payment amount, Homeward argues that it had the right under the deed and note to put Jane's monthly payments in a suspense account and collect late fees and other fees associated with Jane's alleged default. *Id.* at 211 ("[Mr. Rogers:] So, . . . the point is that they were explicitly authorized to apply all those fees because of the partial payment and, therefore, the element of acting inconsistent with legal right hasn't been shown.").

As to wrongful foreclosure and interference with property rights, Homeward essentially repeated its same argument that its decisions complied with the deed and note. *Id.* at 219 ("[Mr. Rogers] [I]f the default was the cause of the foreclosure then the foreclosure was not wrongful."), 226 ("Of course, the interference claim goes the same way. It's also based on the foreclosure. The foreclosure was *authorized*.") (emphasis added in both).

As to IIED, Homeward again repeated its same argument that its decisions complied with the deed and note, and it also argued that there was no evidence to satisfy the second element of IIED, which is extreme and outrageous conduct. R-110 at 130; R-109 at 226 ("The bottom line here is there was a foreclosure. If it was *authorized* there is nothing else in the record that shows that there was any extreme and outrageous conduct.") (emphasis added).

Those are the only arguments that Homeward made in support of its Rule 50 (a) motion. Homeward did not even mention the phrase "punitive damages"

28

during its argument, let alone request judgment as a matter of law on the element of specific intent to cause harm.  And perhaps most telling, Homeward did not move for judgment as a matter of law during the second phase of trial, which is when the parties could present additional evidence and argument regarding punitive damages and when the district court instructed the jury on the issue of specific intent to cause harm.  In fact, when the district court raised the issue of jury instructions during the second phase, Homeward's counsel expressly confirmed that the instructions "look[] fine, Your Honor."  R-111 at 9.

Even though the transcript confirms that Homeward did not request judgment as a matter of law on the issue of specific intent to cause harm and Jane objected to consideration of this new ground, the district court granted Homeward's Rule 50 (b) motion anyway.  R-118 at 21.  The district court held that, "[a]lthough Homeward did not raise this argument in the context of punitive damages during trial, Homeward's arguments regarding the instruction on intent and emotional damages at the charge conference were closely-related to those raised in the present motion."  R-124 at 39.

There are three separate problems with that reasoning.

*First*, a comparison of Homeward's argument during the charge conference shows that they are not closely related to Homeward's argument in support of its Rule 50 (b) motion.  *Ross*, 146 F.3d at 1289 ("[I]f the new and old grounds vary

29

greatly, then a trial judge may not rely on the new grounds to set aside the jury's verdict. If they do vary greatly and the trial court relies upon the new grounds to set aside the jury's verdict, we will reverse.") (citations omitted).

During the charge conference for the first phase of the trial, the district court informed the parties that the court would instruct the jury that "there are additional restrictions under the law for the recovery of emotional distress damages arising from the Plaintiff's wrongful foreclosure claim only. In order for the Plaintiff to recover emotional distress damages arising from a wrongful foreclosure, the Plaintiff must prove [and then listing the elements of IIED]." R-110 at 133.

Jane's counsel, Mr. Gower, objected to this instruction. He argued that "whenever you have an intentional tort of whatever nature, you are entitled to recover emotional damages that are proximately caused." R-109 at 199. "[Y]ou do not have to go further and prove the tort of intentional infliction of emotional distress within the tort of wrongful foreclosure." *Id.* Mr. Gower than asked the district court to add the word "intentionally" to the wrongful foreclosure charge and to "take out that part that says there are additional restrictions from recovering emotional distress damages." *Id.* at 201.

Homeward's counsel, Mr. Rogers, responded that "it's inconsistent with Georgia *Law*." *Id.* He argued that Georgia *law* does not include an "intentional *element* in there," and so "this turns Georgia *law* on its ear to make all these

30

changes." *Id.* at 202 (emphasis added). Mr. Rogers then speculated that it might "ultimately redound to my benefit" if wrongful foreclosure were an intentional tort because, "just to be honest there isn't any evidence of specific intent in this case." *Id.* He then concluded by repeating – "[i]t's just not an intentional tort." *Id.*

The arguments are not *closely* related. Homeward's arguments during the charge conference address a question of "Georgia law" regarding whether the tort of wrongful foreclosure includes an "intentional element in there." *Id.* They do not relate to the separate argument regarding the sufficiency of Jane's evidence regarding Homeward's specific intent to cause harm.

Mr. Roger's speculation about his view of the evidence on intent does not transform that discussion of legal elements of wrongful foreclosure into a request for judgment as a matter of law regarding specific intent to cause harm. For one, Homeward did not request judgment as a matter of law on intent after this charge conference, even though a claim for IIED by its very namesake is an *intentional* tort and a claim for punitive damages also requires evidence of intent. When Mr. Rogers addressed IIED during Homeward's motion for judgment as a matter of law, he addressed only the "extreme and outrageous" element of IIED and he never addressed punitive damages. R-109 at 226 ("The bottom line here is there was a foreclosure. If it was authorized there is nothing else in the record that shows that there was any extreme and outrageous conduct."). In other words, Homeward

31

decided to take its chances with the jury on the issue of intent, and it lost.  Having

taken that "gamble on a jury's verdict," Homeward cannot now "question the

sufficiency of the evidence on appeal."  *Quinn*, 597 F.2d at 1024.

Of course, even if Homeward had requested judgment as a matter of law on

intent, that would not have provided Jane notice regarding the issue of specific

intent to cause harm.  Intent is not a monolithic concept.  There is one level of

intent sufficient to support a claim for IIED or punitive damages – reckless

disregard or a conscious indifference.  And there is a different level of intent

sufficient to exceed the Georgia statutory cap on punitive damages – specific intent

to cause harm.  *See Tolbert*, 242 F.3d at 77 ("A motion that identifies one element

of a claim is insufficient to permit the district court to grant JMOL for lack of

proof of some other, unspecified element, and is insufficient to permit appellate

review of the sufficiency of the evidence as to the unspecified element[.]").

***Second***, even if the arguments were closely related, the closely related

exception does not include a comparison of arguments made during a *jury charge*

conference.  It "compare[s] the grounds originally argued by the movant in its *Rule*

*50(a) motion* with those cited by the trial court in granting a renewed motion for

judgment as a matter of law."  *Ross*, 146 F.3d at 1289; *see also Nat'l Indus., Inc. v.*

*Sharon Steel Corp.*, 781 F.2d 1545, 1549 (11th Cir. 1986) ("There is no question

that Sharon moved for a directed verdict at the close of all the evidence; the issue

is whether that *motion* encompassed damages for lost goodwill and reputation.")
(emphasis added in both).

The district court did cite to one case where this Court looked at arguments a
party made during a jury charge conference. R-124 at 39 (citing *Splitt v. Deltona
Corp.*, 662 F.2d 1142, 1144 (5th Cir. 1981 Unit B).  But in *Splitt*, the party's
argument in the jury charge conference was essentially *identical* to the argument in
the Rule 50 (b) motion.  *Splitt*, 662 F.2d at 1144 ("Counsel for plaintiffs was not
ambushed.  Deltona had argued strenuously against a jury instruction that would
permit a finding of punitive damages on the contract claim.").  In other words,
*Splitt* does not involve the closely related exception; it holds that an argument
made during a jury charge conference can preserve an essentially identical
argument for a Rule 50 (b) motion.

This case illustrates why courts should not apply the closely related
exception to arguments made during a jury charge conference.  Trials are
conducted in real-time and without the benefit of an electronic transcript where
every comment or phrase can be parsed after-the-fact.  Mr. Roger's speculation
about his view of the evidence on intent should not suffice to provide notice to
either the district court or to Jane.  Indeed, even under a "liberal view of what
constitutes a motion for directed verdict," a party must "*clearly* point[] out a
claimed evidentiary deficiency to court and counsel, *not by way of conversation or*

33

*speculation* but on the record in an *unambiguous formal motion* for relief." *Quinn*, 597 F.2d at 1025 (emphasis added). Otherwise, parties will make and courts will have to decide numerous and creative after-the-fact challenges to verdicts based on any comment made at any time during a trial.

***Third***, even if Homeward's arguments were closely related and the closely related exception included arguments made during a jury charge conference, the exception should not apply in a bifurcated proceeding. The first phase of the trial in this case addressed the level of intent sufficient to support a claim for punitive damages – reckless disregard or a conscious indifference. And the second phase of the trial addressed a different level of intent sufficient to exceed the Georgia statutory cap on punitive damages – a specific intent to cause harm.

Once the jury found in Jane's favor during the first phase, the parties had the opportunity to present additional evidence and argument in the second phase. And if Homeward believed that Jane had not presented sufficient evidence on specific intent to harm, it should have requested judgment as a matter of law during this second phase. If Homeward had made such a request, Jane could have put on additional evidence regarding Homeward's intent. But Homeward chose not to do so, and it even affirmatively expressed approval of the district court's charges on specific intent to cause harm. R-111 at 9. The district court was thus barred from considering Homeward's Rule 50 (b) motion. *See, e.g.*, *Shaw v. San Joaquin*

34

*County*, 2006 U.S. Dist. Lexis 34813, at *10-11 (E.D. Cal. May 18, 2006) ("The only Rule 50(a) motion identified by Defendants concerns the request made, on January 17, 2006, at the close of all evidence in the initial compensatory damages portion of the trial.  That request, however, would not have preserved a Rule 50(b) request pertaining to the second, punitive damages portion of the trial conducted on February 21, 2006.").

### B.   There Is Sufficient Evidence to Conclude That Homeward Acted With Specific Intent To Cause Harm.

Georgia law provides that an actor has specific intent to cause harm where "the actor desires to cause the consequences of his act, or . . . he believes that the consequences are substantially certain to result from it."  *J.B. Hunt Transp. v. Bentley*, 207 Ga. App. 250, 255 (1992) (quoting Restatement Torts, 2d, § 8A (1965); *see also* R-111 at 26; *Action Marine, Inc. v. Cont'l Carbon, Inc.*, 481 F.3d 1302, 1313 (11th Cir. 2007).

A party may prove intent by circumstantial evidence, and so a jury may "*infer* specific intent to harm."  *AAF-McQuay, Inc. v. Willis*, 308 Ga. App. 203, 214 (2011) (emphasis added).  And when deciding the sufficiency of evidence on intent, a "court should be cautious in granting a motion for [judgment as a matter of law]."  *Croley v. Matson Navigation Co.*, 434 F.2d 73, 77 (5th Cir. 1970).  "Much depends on the *credibility of the witnesses* testifying as to their own states of mind.  In these circumstances the jury should be given an opportunity to *observe*

*the demeanor*, during direct and cross-examination, of the witnesses whose states of mind are at issue." *Id.* (emphasis added).

Based on these general principles, to show specific intent to cause a wrongful foreclosure, a plaintiff must provide evidence that the defendant intended to foreclose on the plaintiff's real property and the defendant believed that it was substantially certain that the foreclosure would be wrongful. And the same is true for conversion – a plaintiff must provide evidence that the defendant intended to possess the plaintiff's personal property and the defendant believed that it was substantially certain that this possession would be inconsistent with the plaintiff's ownership interest.

In this case, Jane has presented sufficient evidence for a jury to conclude that Homeward acted with the specific intent to cause harm. For well over a year, Jane and Adam repeatedly explained and provided documentary proof to Homeward that the drastic increase in Jane's monthly escrow payments in October 2009 was incorrect. *See, e.g.*, R-89-10 at 1-2 (Pl.'s Ex. 9) ("I have tried to explain this over and over again showing you that in February the 24th via fax and conversation with someone that I though[t] understood was helping resolve this and still nothing."). And yet Homeward continued to insist that Jane pay the inflated amount and never provided any explanation to justify the increase. Homeward then used that indefensible increase to put Jane's monthly payments in

36

a suspense account and collect late fees and other fees associated with a default that Homeward caused. And eventually Homeward used that default to foreclose on Jane's real property at 172 Hilton Street.

Homeward's actions were clearly intentional; it makes no argument that it accidently or negligently foreclosed or failed to apply Jane's loan payments. And based on the absence of any justification for the drastic increase in Jane's monthly escrow payments in October 2009, a jury could infer that Homeward believed it was substantially certain that the foreclosure would be wrongful and that Homeward's placement of Jane's loan payments into a suspense account and collection of late fees and other fees associated with default would be inconsistent with Jane's ownership interest.

A jury could also draw an inference of specific intent to cause harm based on the credibility and demeanor of Homeward's 30(b)(6) representative and only witness – Christopher Delbene. Delbene testified that Jane had to pay whatever amount Homeward demanded, even if the amount was completely unreasonable or a mistake. He testified that Homeward conducts "[the] escrow analysis, not the borrower. We – we conduct our escrow analysis [and] I will not be using the borrower's escrow to answer my questions." R-46 at 106.[2] Delbene confirmed that Homeward is "not going to pay any attention to what [the borrower] says"

---

[2] Delbene's video deposition was played at trial. *See* R-108 at 56, R-110 at 4.

37

because "I base our escrow analysis on our numbers." *Id.*

Delbene made those statements, even though he never actually saw any escrow analysis or numbers to support Homeward's drastic increase in Jane's monthly escrow payments in October 2009. In fact, Delbene knew absolutely nothing about the escrow analysis, and Homeward did not provide any witness or document who could explain or defend it. R-46 at 55 ("I don't know when the escrow analysis was performed, sir. . . . Q. Do you have a copy of it? A. No, I do not."); *id.* at 56 ("I have not seen it. I do not know what figures went into that escrow analysis.").

As the district court explained, "the only testimony about [the October 2009 escrow increase] is the testimony from Delbene, who on the one hand said it was done and then every other time he had anything to say about the escrow . . . evaluation, is that he didn't know anything about it." R-110 at 49. And even Homeward's counsel conceded that, "frankly my take away from Mr. Delbene is the same as yours . . . *a bag full of 'I don't know*.'" *Id.* at 50 (emphasis added).

In holding that there was not sufficient evidence for a jury to conclude that Homeward acted with the specific intent to cause harm, the district court relied on a number of irrelevant factors, none of which are required by Georgia law to prove specific intent to cause harm.

For example, the district court said that there is "no evidence suggesting that

Homeward bore any *particular* animus against Plaintiff." R-124 at 41 (emphasis added). But Georgia law does not require that Homeward *singled* out Jane. Nor does it even require that Homeward wanted to harm Jane. "Intent is not . . . limited to consequences which are desired. If the actor *knows* that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact *desired* to produce the result." Restatement Torts, 2d, § 8A, Cmt. b. (1965) (emphasis added).

The district court also said that there is "no evidence suggesting that Homeward . . . would have been substantially enriched by harming Plaintiff." R-124 at 41. But the jury heard evidence that suggests otherwise. If a borrower refuses to comply with Homeward's improper payment demands, Homeward can treat the borrower's payments as late and collect late fees as income. R-46 at 81 ("[W]e recoup the fee. It's a late charge, yes. Homeward Residential, the servicer – it takes the money."). Although the late fees on any one loan may be small, Homeward "is the 13th largest mortgage servicer in the country managing nearly *$71 billion* in loan servicing, representing approximately *374,000* customers." R-89-5 at 1 (Pl.'s Ex. 46) (emphasis added). A jury was entitled to conclude that the aggregation of improper fees involving billions of dollars and hundreds of thousands of customers could provide substantial financial benefit.

The district court commented that "[t]he sale of the property in fact resulted

39

in a huge loss." R-124 at 42. But Homeward is the *servicer*; it did not previously own or later buy Jane's real property at 172 Hilton Street. The trust owned Jane's mortgage, and it was the trust that purchased and still possesses the property at 172 Hilton Street. R-108 at 41 ([Mr. Rogers] "The trustee then gets another company to handle virtually all of the day-to-day affairs of the trust. That company is called a servicer. And what a servicer does mainly is collect on the loans."). Although the trust bought the property at $25,000, they may very well sell the property for a much higher value after this lawsuit is completed.

Of course, Georgia law does not require that Homeward financially benefit from harming Jane. In fact, even if the jury were required to accept that Homeward lost money, that may actually *strengthen* the inference of Homeward's specific intent to harm. After all, if Jane was making monthly payments on a loan that exceeded the value of the real property securing the loan, Homeward had a financial incentive to continue accepting Jane's money. That Homeward would act contrary to its own financial interests suggests an abuse of power or vindictiveness. As Delbene himself confirmed, Homeward is "not going to pay any attention to what [the borrower] says." R-46 at 106.

In that respect, Homeward's actions are similar to those of a rogue police officer, who abuses his or her power and loses the defense of official immunity. Indeed, under Georgia law, the standard for piercing official immunity is the same

40

as the standard for establishing specific intent to cause harm.  *See Bateast v. Dekalb County*, 258 Ga. App. 131, 132 (2002) ("[A]ctual malice as used in the context of official immunity requires a deliberate intention to do wrong.").

And in case after case, courts applying Georgia law have held that, where a police officer acts without any justification, a jury can infer specific intent to cause harm.  *See, e.g.*, *id.* ("Under Bateast's version of the facts, which we must accept, Bateast provided Officers Goggins and Franklin with documents clearly showing her name and date of birth prior to the time that they decided to arrest her.  This, in turn, would allow a jury to make a reasonable inference that Officers Goggins and Franklin proceeded in their arrest of Bateast despite their knowledge that she had not committed the crimes for which they accused her, thereby deliberately intending to do a wrongful act."); *Williams v. Cobb County Sheriff's Office*, 2014 U.S. Dist. LEXIS 87408, at *14-15 (N.D. Ga. June 26, 2014) (same).  The same principle applies to Homeward.  Because Homeward drastically increased Jane's monthly escrow payments in October 2009 without any justification, a jury can infer that Homeward acted with specific intent to cause harm.

In sum, the district court erred in granting Homeward judgment as a matter of law on the issue of specific intent to cause harm and in reducing the jury's award of punitive damages to $250,000.  This Court should reverse the district court's ruling on this issue and remand with instructions for the district court to

41

enter judgment reinstating the jury's award of $3,000,000 in punitive damages.

## II. Homeward Is Liable For Violating Georgia RICO, And Jane Is Entitled To Additional Remedies For Those Violations.

The Georgia RICO Act makes it "unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money." O.C.G.A. § 16-14-4 (a).

A "'[p]attern of racketeering activity' means [ ] [e]ngaging in at least two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents." O.C.G.A. § 16-14-3 (8)(A).

"'Racketeering activity' means to commit, to attempt to commit, or to solicit, coerce, or intimidate another person to commit" any number of certain enumerated crimes – including the crimes of theft by conversion and theft by taking. O.C.G.A. § 16-14-3 (9)(A); *see also* O.C.G.A. § 16-14-3 (9)(A)(ix) (incorporating "Article 1 of Chapter 8 of this title, relating to theft"); O.C.G.A. § 16-8-4 ("Theft by conversion"); O.C.G.A. § 16-8-2 ("Theft by taking").

The Georgia RICO act also provides for a private cause of action and enhanced remedies. "Any person who is injured by person of any violation of Code Section 16-14-4 shall have a cause of action for three times the actual

42

damages sustained and, where appropriate, punitive damages.  Such person shall also recover attorneys' fees in the trial and appellate courts and costs of investigation and litigation reasonably incurred."  O.C.G.A. § 16-14-6 (c).

In this case, Jane presented sufficient evidence for the district court to submit her Georgia RICO claims to the jury, and by their special verdict, the jury has already made the factual findings necessary for Jane's Georgia RICO claims.

Homeward is a person within the meaning of the Georgia RICO Act.  *See Williams Gen. Corp. v. Stone*, 280 Ga. 631, 631 (2006).  Homeward engaged in a pattern of racketeering activity.  The jury found that Homeward committed at least one act of theft by conversion by finding specifically that Homeward converted Jane's personal property – either by collecting unauthorized late fees from her loan payments or by not applying those payments to her loan.  R-93 at 1; R-110 at 126-29.  The jury also found that Homeward committed at least one act of theft by taking by finding specifically that Homeward wrongfully interfered or foreclosed on Jane's real property.  R-93 at 1; R-110 at 123-26, 29-30.  Those findings also included findings on intent and knowledge.  *Id.* at 129-31.  And Homeward's misconduct caused Jane to suffer actual damages.  *Id.* at 126.

The district court, however, granted Homeward summary judgment on Jane's Georgia RICO claims based solely on a single transaction defense.  "Homeward's alleged act of unreasonably increasing Plaintiff's monthly payment

43

without due notice and converting her payments and, eventually, the [real]

[p]roperty, is simply *one extended transaction*."  R-62 at 49.  "As there is only *one*

*transaction*, Plaintiff's RICO claim cannot survive summary judgment."  *Id.*

(emphasis added in both).

The district court's ruling is wrong for two reasons.  First, the Georgia RICO

Act does not provide for a single transaction defense.  Second, even if the Georgia

RICO Act did provide for such a defense, there is sufficient evidence for a jury to

conclude that Homeward's predicate acts were not part of a single transaction.

## A.    The Georgia RICO Act Does Not Provide For A Single Transaction Defense.

The district court simply misread the requirement of interrelated predicate

acts; it actually prohibits a single transaction defense.  The plain language of the

Georgia RICO Act says that a "'[p]attern of racketeering activity' means [ ]

[e]ngaging in at least two acts of racketeering activity in furtherance of ***one or***

***more*** incidents, schemes, or ***transactions*** that have the same or similar intents,

results, accomplices, victims or methods of commission or otherwise are

interrelated by distinguishing characteristics and are not isolated incidents."

O.C.G.A. § 16-14-3 (8)(A) (emphasis added).  Because the plain language

expressly allows for one transaction to provide the predicate acts, the district court

had no authority to apply a single transaction defense.

In the past, the Georgia Court of Appeals did apply a single transaction

44

defense.  The Georgia RICO Act previously said that "'[p]attern of racketeering activity' means engaging in at least **two incidents** of racketeering activity that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise interrelated by distinguished characteristics and are not isolated incidents."  O.C.G.A. § 16-14-3 (8) (2000) (emphasis added).  And based on this older statutory language, the Georgia Court of Appeals judicially recognized a single transaction defense, "stating that the fact that elements of two crimes may have been present at two separate points in time does not create two predicate acts out of what is in reality of a single transaction.  This reluctance manifested itself in a series of cases through 2000."  John E. Floyd, "Georgia RICO," *Georgia Business Litigation* at 290 (2014).

But effective July 1, 2001, the Georgia General Assembly amended the Georgia RICO Act specifically to "adopt a new definition" of "pattern of racketeering activity."  *Id.*  "[T]his language was clearly intended to *put an end to the single transaction defense*, by changing 'incidents' to 'acts' and expressly providing that a single transaction involving two or more acts of racketeering activity can constitute a pattern[.]"  *Id.* at 290-91 (emphasis added).

In applying a single transaction defense to this case, the district court misread the Georgia RICO Act and ignored the fact that the Georgia General Assembly amended the statute effective July 1, 2011.  In fact, the district court

45

exclusively cited cases decided before July 1, 2011, which are inconsistent with the

current statutory language and should not be followed.  R-62 at 48-49 (citing

*Stargate Software Int'l, Inc. v. Rumph*, 224 Ga. App. 873, 877 (1997), *Brown v.*

*Freedman*, 222 Ga. App. 213, 217 (1996), *Raines v. State*, 219 Ga. App. 893, 894

(1996), *Emrich v. Winsor*, 198 Ga. App. 333, 333 (1991), *Cobb v. Kennon Realty*

*Servs., Inc.*, 191 Ga. App. 740, 741 (1989), and *S. Intermodal Logistics, Inc. v. D.J.*

*Powers Co.*, 10 F. Supp. 2d 1337, 1359 (S.D. Ga. 1998)).

Indeed, other courts have correctly refused to apply cases decided before

July 1, 2011.  "To support their legal argument, the Defendants refer to the Court

to *Rumph*. . . . The Court acknowledges this case, but also reads the plain language

of the statute to define a 'pattern of racketeering activity' as 'at least two acts of

racketeering activity in furtherance of *one* or more . . . *schemes*, or *transactions*[.]"

*Advanced Tech. Servs. Inc. v. KM Docs, LLC*, 2011 U.S. Dist. LEXIS 134567, at

*10-11 (N.D. Ga. Nov. 21, 2011).

To be sure, like the district court in this case, some courts have not realized

that the Georgia General Assembly amended the Georgia RICO Act.  "[B]oth

Georgia and federal courts still sometimes cite single transaction decisions,

inexplicably failing to acknowledge the 2001 amendment."  Floyd, *Georgia*

*Business Litigation* at 291.  And so there are some cases decided after July 1, 2011

from the Georgia Court of Appeals and Georgia federal district courts that still

46

apply a single transaction defense.

But this Court is bound only by the current language of the Georgia RICO Act and cases from Georgia Supreme Court. The Court is not bound by cases decided by the Georgia Court of Appeals or any Georgia federal district court. "When an intermediate state court decision is at odds with an existing statutory scheme or one amended after the issuance of the intermediate court's decision, a federal court may justifiably surmise that the statute presents persuasive data that the state's highest court would not follow the intermediate court's decision." *Assicurazioni Generali, S.p.A. v. Neil*, 160 F.3d 997, 1003 (4th Cir. 1998).

That principle is especially true here because, in the cases decided after July 1, 2011, the courts are not just wrong; they do not even appear to recognize the amended language. The cases either incorrectly quote the no-longer-effective language or they rely on cases decided before July 1, 2011. *See Pollman v. Swan*, 314 Ga. App. 5, 7 n.3 (2011) (discussing a "single transaction" defense and citing *Raines* and *Cobb*); *Smith v. Chemtura Corp.*, 297 Ga. App. 287, 291 (2009) ("'A 'pattern [of racketeering activity]' means engaging in at least *two incidents* of racketeering activity . . . .'") (emphasis added); *Dial HD, Inc. v. Clearone Commc'ns., Inc.*, 2010 U.S. Dist. LEXIS 93333, at 49 (quoting *Smith* and *Rumph*); *Foxworthy, Inc. v. CMG Life Servs., Inc.*, 2012 U.S. Dist. LEXIS 53009, at *19 (quoting *Cobb*); *Franklin v. Consus Ethanol LLC*, 2012 U.S. Dist. LEXIS 123676,

at *10 (quoting *Cobb* and *Foxworthy*).

**B.    There Is Sufficient Evidence To Conclude That Homeward's Predicate Acts Were Not Part Of A Single Transaction.**

Even if the Georgia RICO Act did provide for a single transaction defense, Jane still presented sufficient evidence to conclude that Homeward's predicate acts were not part of a single transaction.

Even analyzing the conduct very narrowly, there were multiple transactions. One transaction was Homeward's servicing of the loan for 172 Hilton Street, and the predicate acts involved in that transaction were Homeward's theft by conversion of Jane's *personal property* – either by collecting unauthorized late fees from her loan payments or by not applying those payments to her loan.  R-93 at 1; R-110 at 126-29.  Another transaction was Homeward's foreclosure of Jane's ownership of 172 Hilton Street, and the predicate acts involved in that transaction were Homeward's theft by taking of Jane's *real property*.  R-93 at 1; R-110 at 123-26, 29-30.  And there were additional transactions involving the servicing of Jane's *six other loans*, and the predicate acts involved in those transactions were Homeward's theft by conversion of Jane's personal property.  *See, e.g.*, R-108 at 84 ("[D]id you find the similar type problems on those other six as you did this one? A. Yes."); R-109 at 61 ("[I]t's identical to the same thing that happened at 172 Hilton.").

This evidence makes the facts in this case similar to those in *Brown*.  In that

48

case, even though the dispute involved only one house, the court held that the

lender's failure to properly apply the borrower's payments was one transaction and

the lender's theft of the borrower's personal property in the house was another

transaction.  *Brown*, 222 Ga. App. at 217-18 ("The two predicate acts described are

not part of one transaction; improper accounting on the note is separate from the

conversion of personal property after the sale.").  By contrast, the facts in this case

are different from those in *Cobb*.  In that case, the dispute involved not only one

house, but the predicate acts all related to the inducement to *purchase* the house

and did not extend to how lenders or guarantors serviced the loan or foreclosed.

*Cobb*, 191 Ga. App. at 742 ("The inducements included Cobb's receipt of $4,000

of the loan proceeds, the assurance that Miller would pay back over $14,000 of the

indebtedness within a few weeks upon his church being refinanced, and the debt

also being secured by the property being purchased by Miller.").

     In sum, the district court erred in granting Homeward summary judgment on

Jane's Georgia RICO claims.  The Court should reverse the district court's ruling

on this issue.  Because the jury made findings by special verdict and those findings

provide the elements necessary for Jane's Georgia RICO claims, the Court should

also remand with instructions for the district court to enter judgment in accordance

with the Georgia RICO remedies.  With those additional remedies, Jane is entitled

to (1) $1,518,000 in RICO damages, which is three times the actual damages

49

sustained ($500,000 in emotional damages plus $6,000 in other compensatory or actual damages); (2) $3,000,000 in punitive damages, which is permitted in addition to RICO damages; and (3) attorney fees in the trial and appellate courts and costs of investigation and litigation reasonably incurred. *See* R-93 at 2; O.C.G.A. § 16-14-6 (c).

Under this new judgment, Jane's trebled RICO damages – $1,518,000 – would replace her existing compensatory damages – $506,000. "[T]here is no reason . . . to fear a double recovery. Just as these are alternative claims, the damages are alternative as well; [Jane] will recover the larger of either the state-claim [common law] damages or the RICO damages." *AIG Aviation, Inc. v. Boorom Aircraft*, *Inc.*, 1998 U.S. App. LEXIS 2143, at *15-16 (6th Cir. feb. 11, 1998). Jane's punitive damages – $3,000,000 – would be reinstated and in addition to her trebled RICO damages. And on remand, Jane may submit evidence of attorney fees and costs of investigation and litigation reasonably incurred.

## III.  Jane Can Recover Emotional Damages Caused By Homeward's Wrongful Foreclosure Without Also Having to Prove IIED.

Georgia law provides that "when the claim is for intentional misconduct, damages for mental distress may be recovered without proof of physical injury." *Hamilton v. Powell, Goldstein, Frazer & Murphy*, 252 Ga. 149, 150 (1984). In fact, "[t]he Georgia Reports are replete with decisions allowing for the recovery of emotional distress damages proximately caused by . . . intentional torts."

50

*Blackburn v. BAC Home Loans Servicing, LP*, 914 F. Supp. 2d 1316, 1326 (M.D. Ga. 2012).

The reason for that rule is that an injured party should be made whole by means of compensatory damages, and compensatory damages include emotional damages. "That damages for mental suffering are compensatory in character can hardly be open to question. 'Wounding a man's feelings is as much actual damage as breaking his limbs.'" *Dunn v. W. Union Tel. Co.*, 2 Ga. App. 845, 851 (1907). "Such damages may in the very nature of things be just as proximately and naturally the consequence of the defendant's as any other damage; so that there is no legitimate objection to their allowance for any lack of this element." *Id.* "Nor can it be justly said that an allowance for mental suffering is any more speculative or conjectural than damages for physical pain and suffering." *Id.* at 851-52.

As a result, the Georgia Supreme Court has permitted injured parties to recover emotional damages based solely on proof of an intentional tort and without requiring the party to also prove IIED or physical injury. *See Montega Corp. v. Hazelrigs*, 229 Ga. 126, 126-27 (1972) ("What the plaintiff relies upon . . . is that an intentional trespass to property will support a claim for mental illness occasioned thereby, unaccompanied by actual physical injury. . . . [W]here a willful and intentional tort is committed against another, though such tort be in reference to property rights, in a proper case the tortfeasor may be liable for

injuries to the plaintiff's health resulting from such tort."); *Stewart v. Williams*, 243 Ga. 580, 582 (1979) ("We find that the plaintiff has instead sued for the intentional tort of false imprisonment. . . . Based on this intentional tort, the trial court did not err in its charge to the jury which permitted the jury to award damages for mental pain and suffering even though the plaintiff alleged no physical injury.").

The same is true for the Georgia Court of Appeals. *See, e.g.*, *Fuqua Television, Inc. v. Fleming*, 134 Ga. App. 731, 734 (1975) (analyzing a claim for "intent[ional]" "defamacast" and holding that "'actual damages' is not necessarily limited to pecuniary loss" and "[w]ounding a man's feelings is as much *actual damage* as breaking his limbs"); *Wright v. Wilcox*, 262 Ga. App. 659, 662 (2003) (analyzing a claim for "wilful trespass" and holding that "significant emotional and physical discomfort" was enough for "the jury [to] hold Wright liable for general and nominal damages"); *Zieve v. Hairston*, 266 Ga. App. 753, 759-60 (2004) (physical precedent) (analyzing a claim for "fraud" and holding that "the additional embarrassment and ridicule suffered by Hairston . . . was sufficient to submit the issue of actual damages to the jury").

In this case, the district court correctly instructed the jury that they could award emotional damages if Jane proved either her conversion claim or interference with property rights claim. The district court did not require that Jane also prove IIED to recover emotional damages for those claims, and Homeward

52

did not to object to these instructions.  *See* R-109 at 197.

However, when it came to wrongful foreclosure, the district court incorrectly instructed the jury that, before they could award emotional damages, Jane also had to prove the separate tort of IIED.  The district court told the jury that:

> [T]here are *additional* restrictions under the law for the recovery of emotional distress arising from the Plaintiff's wrongful foreclosure claim *only*.  In order for the Plaintiff to recover emotional distress damages arising from a wrongful foreclosure, the Plaintiff must prove [and then listing the elements of IIED].

R-110 at 133 (emphasis added).

This instruction is incorrect, and Jane conditionally appeals the district court's instruction.  R-109 at 198-99.  Jane's appeal of this issue is conditional because the jury did, in fact, find that Jane had satisfied the additional elements of IIED, and so there is no need to address this third issue if the Court affirms the district court's judgment on that claim.  R-93 at 2.  And because the trial court instructed the jury that, for Jane's conversion and interference with property rights claims, she did not have to prove the elements of IIED to recover emotional damages, there is also no need to address this third issue if the Court affirms the district court's judgment on those claims.  R-110 at 133.  The Court must decide this issue only if, based on Homeward's cross-appeal, the Court directs judgment as a matter of law on all of Jane's claims except her wrongful foreclosure claim or if the Court orders any new trial involving Jane's wrongful foreclosure claim.

53

The reason why the instruction is incorrect is that Georgia law allows injured parties to recover emotional damages if the party established the damages were caused by an intentional tort, and Georgia courts have repeatedly permitted parties to recover such damages without requiring the party to also prove the separate tort of IIED.

There are some cases decided by the Georgia Court of Appeals where the court has required a plaintiff in a wrongful foreclosure case to also prove the separate tort of IIED before recovering emotional damages. *See McCarter v. Bankers Trust Co.*, 247 Ga. App. 129, 133 (2000); *DeGolyer v. Green Tree Servicing, LLC*, 291 Ga. App. 444, 449 (2008). But none of those cases addresses whether the plaintiff *should* have had to prove the separate tort of IIED. It is likely that in those cases, the plaintiff never argued he or she did not have to prove IIED or the court may have simply assumed that the plaintiff had to prove IIED without actually analyzing the issue.

By contrast, in the cases where the plaintiff raised and the court analyzed this issue, the court has held that a plaintiff does not have to prove the separate tort of IIED before recovering emotional damages. "[T]he better-reasoned cases are those that treat the tort of IIED as a separate cause of action, and thus allow emotional distress damages for well-recognized intentional torts when the plaintiff proves the essential elements of the well-established tort and that the intentionally

54

tortious conduct proximately caused the emotional distress damages." *Blackburn*, 914 F. Supp. 2d at 1329; *see also Cruthis v. Firstar Bank, N.A.*, 822 N.E.2d 454, 467 (Ill. App. Ct. 2004) ("[T]he plaintiffs did not allege that the defendant committed the independent tort of intentional infliction of emotional distress, and they need not have done so.").

Indeed, courts have singled out the Georgia Supreme Court's statements as controlling over the ambiguous nature of some cases decided by the Georgia Court of Appeals. "These conflicting opinions in cases decided by the Court of Appeals certainly muddy the water as to where the Court of Appeals stands on the issue. But, the limited precedent from the Supreme Court of Georgia, which this Court must follow, seems to be clear." *Blackburn*, 914 F. Supp. 2d at 1330; *see also Clark v. West*, 196 Ga. App. 456, 458 (1990) (physical precedent) ("[W]e cannot approve the dismissal of appellant's remaining claims simply by labeling them a cause of action for 'intentional infliction of emotional distress,' where the complaint alleges an established tort – wrongful foreclosure – and seeks damages . . . for mental distress as a result of its intentional commission. *Established law* in this State allows the award of damages for such a claim.") (emphasis added).

In sum, the district court erred in instructing the jury that, when it came to wrongful foreclosure, they could award emotional damages only if Jane also proved the separate tort of IIED. And if it becomes necessary to decide this issue,

55

this Court should hold that Jane can recover emotional damages for wrongful foreclosure without having to prove IIED.

## CONCLUSION

For those reasons, this Court should reverse the district court's ruling granting Homeward judgment as a matter of law on the issue of specific intent to cause harm and the district court's ruling granting Homeward summary judgment on Jane's Georgia RICO claims.  The Court should remand with instructions for the district court to enter judgment reinstating the jury's award of punitive damages and to enter judgment in accordance with the Georgia RICO remedies. And as for the district court's incorrect instructions regarding wrongful foreclosure, the Court should decide that issue only if it becomes necessary to do so based on Homeward's cross-appeal.

This brief is submitted on September 15, 2014.

**/s/ Naveen Ramachandrappa**

Michael B. Terry
Ga. Bar No. 702582
Naveen Ramachandrappa
Ga. Bar No. 422036
BONDURANT MIXSON &
ELMORE LLP
1201 W Peachtree St NW
Ste 3900
Atlanta, GA 30309
404-881-4100
terry@bmelaw.com
ramachandrappa@bmelaw.com

Charles A. Gower
Ga. Bar No. 303500
Miranda J. Brash
Ga. Bar No. 475203
CHARLES A. GOWER, P.C.
1425 Wynnton Rd
PO Box 5509
Columbus, GA 31906
706-324-5685
charlie@cagower.com
miranda@cagower.com

**Attorneys for Jane McGinnis**

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains a total of 13,918 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and 11th Cir. R. 32-4.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word with size 14 Times New Roman font.

This certification is made on September 15, 2014.

**/s/ Naveen Ramachandrappa**

58

## CERTIFICATE OF SERVICE

I certify that I have served **JANE MCGINNIS'S BRIEF** by US mail and by

using the Court's ECF system on the following counsel of record:

Daniel S. Reinhardt
Michael E. Johnson
Benjamin W. Cheesbro
TROUTMAN SANDERS LLP
600 Peachtree St NE
Ste 5200
Atlanta, GA 30308
404-885-3000
daniel.reinhardt@troutmansanders.com
michael.johnson@troutmansanders.com
benjamin.cheesbro@troutmansanders.com

Russell J. Rogers
THOMPSON HINE LLP
3560 Lenox Rd
Ste 1600
Atlanta, GA 30326
404-541-2900
russell.rogers@thompsonhine.com

This certification is made on September 15, 2014.

**/s/ Naveen Ramachandrappa**

59